**PENN TANKER COMPANY, Plaintiff,**

**v.**

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 66–G–5.**

United States District Court,
S. D. Texas,
Galveston Division.

Jan. 26, 1970.

Carl O. Bue, Jr., Royston, Rayzor & Cook, Houston, Tex., for plaintiff.

Anthony J. P. Farris, U. S. Atty., S. D. Texas, Houston, Tex., for defendant.

### MEMORANDUM OPINION WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW

FISHER, Chief Judge.

This civil action was brought by Penn Tanker Company for indemnity and, alternatively, as assignee by operation of law of the claim of James Hodges, deceased, against the United States of America, pursuant to the Federal Tort Claims Act, 28 U.S.C.A. § 2674. Hodges was a seaman employed by Penn Tanker on its vessel the S/S PENN CHALLENGER. On August 15, 1963, he sustained injuries to his eyes while welding in the course of his employment. Hodges brought a Jones Act suit against Penn Tanker in state court based upon the injuries he received in that accident. His eye condition was diagnosed as glaucoma during treatment of his injury at the United States Public Health Service Hospital at Galveston, Texas. In the course of that treatment Hodges underwent an operation on his right eye, as a result of which he lost the sight in that eye.

Faced with a claim for increased damages as a result of Hodges' loss of sight, Penn Tanker sought to implead the United States in the state court action. The Government, however, obtained dismissal on jurisdictional grounds. Penn Tanker then collaterally brought an action for indemnity against the United States in this Court, which was stayed pending the outcome of the state court suit. Subsequently, Hodges committed suicide, and his mother, Mrs. Evelyn Hodges, as temporary administratrix and the personal representative of her deceased son, was substituted as party-plaintiff in the state court action, which suit was broadened to encompass the wrongful death action. Thereafter a compromise agreement was entered into between Mrs. Hodges and Penn Tanker by which Penn Tanker paid a total sum of $25,000. The state court action was terminated by an agreed judgment, and a covenant not to sue and an assignment of any cause of action possessed by Mrs. Hodges in her various capacities against the United States was made to Penn Tanker, with the proviso that any recovery in excess of the settlement sum would be for the account of the estate of James Hodges.

Penn Tanker's suit against the United States in this Court then proceeded to trial. Eventually, this Court entered judgment awarding Penn Tanker $12,-500 as "fifty (50%) per cent indemnity," finding that Penn Tanker was precluded from obtaining full indemnity from the United States because Hodges had received a welding burn to his eyes on board Penn Tanker's vessel, and finding further that the glaucoma condition of his eyes would have been permanent if an operation had not been performed. On appeal the cause was reversed and remanded for new and appropriate findings of fact and conclu-

sions of law, 409 F.2d 514 (5th Cir. 1969). The Court of Appeals held that the liability vel non of either or both of the parties was a matter which this Court should have considered and as to which it should have articulated its conclusion. Also, it was decided that the Court should have determined whether the settlement between Penn Tanker and Mrs. Hodges was reasonable under the circumstances.

We are now instructed to enter new findings including the following matters:

(1) Whether Penn Tanker was in fact liable to Hodges;

(2) If so, whether the settlement was in a reasonable amount;

(3) What proportion was fairly attributable to the damages occasioned by the hospital malpractice for which the Government is responsible as against the injury done by Penn Tanker, including the anticipatable ultimate consequences.

In accordance with these instructions, we now make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1.

James R. Hodges, a 27-year-old unmarried seaman, was employed as a second pumpman on board the S/S PENN CHALLENGER, a vessel owned and operated by Plaintiff Penn Tanker Company, from July 29, 1963, through August 21, 1963. On August 15, 1963, while using a welding torch in the performance of his duties on board the vessel, Hodges sustained welding burns to his eyes. Penn Tanker Company was negligent in supervising the welding operation which Hodges was performing. This negligence on the part of Penn Tanker caused it to be also legally liable to James Hodges for all damages suffered by him or his estate, including the consequential damage occasioned by the negligence and malpractice chargeable to the Government.

### 2.

On August 26, 1963, James Hodges was admitted to the United States Public Health Service Hospital, Galveston, Texas. He complained of severe pain in both eyes, gave a history of blurred vision for a period of about 48 hours and of frequent aching of the eyeballs for the past month. He also related having seen halos "off and on" for two years. No history was given during any of his subsequent numerous admissions to the United States Public Health Service Hospital or Veterans Administration Hospital with respect to a welding burn of the eyes. The initial diagnosis at Galveston by the treating ophthalmologist was chronic simple (narrow angle) glaucoma and acute congestive glaucoma in both eyes, a diagnosis which was actually in conflict with that of the doctors who examined Hodges in Staten Island Public Health Service Hospital and the Veterans Administration Hospital at Houston, where a diagnosis of pigmentary glaucoma was subsequently made.

### 3.

James Hodges had a long history of psychiatric disturbance commencing with his first hospitalization in the psychiatric unit of the Public Health Service Hospital, Fort Worth, September 18, 1956, to December 9, 1956, and again from July 11, 1957, to February 17, 1958. The basic diagnosis was schizophrenic reaction. He was later hospitalized for this same problem at the John Sealy Hospital from March 23 to July 10, 1958, where he was treated with insulin, induced comas, electric shock therapy, and various drugs. He manifested suicidal tendencies on at least eight instances during these hospitalizations. Following this course of treatment, he returned to sea and worked on ocean vessels with reasonable regularity from January 15, 1961, through his service on the S/S PENN CHALLENGER which terminated on August 21, 1963.

**4.**

The treating and operating ophthalmologist at the United States Public Health Service Hospital at Galveston was Dr. Lynn H. Hammerstadt. He was under the direct supervision of the Administrator of the United States Public Health Service Hospital at Galveston, Dr. Milo Blade. In August, 1963, Dr. Hammerstadt's history as an alcoholic became known to Dr. Blade, and in October, 1963, as a result of Dr. Hammerstadt's excessive drinking, Dr. Blade was instrumental in having him hospitalized in the closed psychiatric ward of the John Sealy Hospital, where he remained from October 14 through October 19, 1963. The diagnosis was delirium tremens and convulsive seizure with the impression of acute brain syndrome, and the prognosis following withdrawal from alcohol was "very guarded."

**5.**

While in the John Sealy closed psychiatric ward, Dr. Hammerstadt was under the care and treatment of a psychiatrist, Dr. B. W. Henry, who released Dr. Hammerstadt from the hospital following consultation with Dr. Milo Blade. Dr. Blade explained that he needed Dr. Hammerstadt's professional services as an ophthalmologist at the Galveston Public Health Service Hospital. It was understood that Dr. Hammerstadt was to be used in the clinic dispensary with the full understanding and agreement of Dr. Blade that Dr. Hammerstadt was not to perform surgery until it could be determined how he was getting along on the prescribed therapy and how well he was able to control his drinking. Instead, Dr. Blade permitted Dr. Hammerstadt to return to full duty without any restriction as to the type of duties which he could perform.

**6.**

Dr. Blade was thereafter aware that Dr. Hammerstadt was not progressing well under the therapy prescribed for his alcoholic syndrome. Dr. Hammerstadt was absent from his job from October 27 through October 31 and from November 19 through November 20, 1963. Dr. Blade attributed some of the illness to asthma and some to excessive drinking. Dr. Hammerstadt was again hospitalized for an alcoholic condition in the closed psychiatric ward of John Sealy Hospital from December 2 to December 11, 1963.

**7.**

James Hodges was personally treated by Dr. Hammerstadt for glaucoma at all material times before the operation at the Galveston Public Health Service Hospital. His diagnosis as to the type of glaucoma (i. e., chronic simple narrow angle glaucoma and acute congestive glaucoma) was improper, as was the operation decided upon by Dr. Hammerstadt (a basal iridectomy of both eyes). Hodges was finally persuaded to consent to the operation by Dr. Hammerstadt, and on November 25, 1963, he was admitted to the Galveston Public Health Service Hospital with surgery scheduled for the following morning.

**8.**

An inadequate and improper pre-operative workup of the patient was done by Hammerstadt, including a failure to obtain a clearly indicated psychiatric evaluation of the patient in view of his background and extreme apprehension. Furthermore, the decision to operate was made by Dr. Hammerstadt though the dilation of the pupil of the patient's right eye indicated that the medication which had been administered prior to the operation was ineffective to prepare the eye for surgery.

**9.**

An improper operation was performed by Dr. Hammerstadt on the right eye of James Hodges, tearing the iris and puncturing the lens and thereby causing a cataract to form. There immediately resulted a massive hemorrhage in the anterior chamber between the cornea and lens of the eye.

**10.**

Improper post-operative care was rendered by Dr. Hammerstadt in that surgery-induced bleeding was uncontrolled, causing increased pressure in the right eye of Hodges and thereby forcing the iris out of the anterior chamber with blood staining of the cornea resulting in permanently impaired vision.

**11.**

As a result of improper diagnosis, improper preoperative workup, improper surgery, and improper post-surgical care by Dr. Hammerstadt, James Hodges completely lost the sight in his right eye. Hodges thereafter developed a dread of any further eye operation as a result of this experience and refused to submit to any corrective operative procedure on either eye. Hodges subsequently became depressed and despondent over his inability to go to sea. Though Dr. Hammerstadt and the Galveston Marine Hospital had declared him to be fit for duty—improperly so and in contradiction of the Parkview Clinic of Houston, which had found him to be unfit for service as a seaman—Hodges was subsequently removed from the crew of the S/S ERNA ELIZABETH in New York. Hodges was totally disabled and did not return to sea nor follow any other gainful employment thereafter. He took his own life on March 6, 1965.

## CONCLUSIONS OF LAW

**1.**

This case is properly brought under the Federal Tort Claims Act, 28 U.S.C.A. § 2674. This Court has jurisdiction, and venue is in this district and division. The parties are properly before the Court.

**2.**

■ Dr. Lynn Hammerstadt was guilty of malpractice in the diagnosis, preoperative and postoperative medical treatment given to James Hodges and in the actual performance of the operation on Hodges' right eye at the time and under the circumstances then existing. Such malpractice was a proximate cause of James Hodges' losing the sight in his right eye.

**3.**

■■ The United States of America, through the administrator of the Public Health Service Hospital at Galveston, Texas, Dr. Milo Blade, was negligent in permitting Dr. Hammerstadt to operate on the right eye of James Hodges, and in permitting Dr. Hammerstadt to attend, treat, and diagnose Hodges' condition under the circumstances then existing. Such negligence was a proximate cause of the subsequent despondency and depression of Hodges which precipitated his fear of any subsequent operation on his eyes, which, if performed successfully, would have arrested and controlled the glaucoma condition.

**4.**

While there is some evidence in the record that James Hodges was greatly disturbed and overwrought because of the fact that he would not be able to go to sea again, the Court does not find from a preponderance of the evidence that the loss of sight in his right eye was a proximate cause of Hodges' taking his own life.

**5.**

■ The overall settlement for $25,-000 between Mrs. Evelyn Hodges and Penn Tanker, including a covenant not to sue and an assignment of whatever cause of action Mrs. Hodges in her various capacities might possess against the Government, was reasonable and fair under the circumstances of this case.

**6.**

■ When Penn Tanker paid the damages for which it was liable but which were caused by aggravation of the eye injury through negligence and malpractice chargeable to the Government, Penn Tanker became an assignee

by operation of law, to which assignment the Anti-Assignment Statute, 31 U.S.C.A. § 203 et seq., is inapplicable. Penn Tanker then alternatively stood in Hodges' shoes to prosecute his claim against the Government.

7.

The Galveston Marine Hospital was negligent in failing to enforce proper and recognized medical procedure at all material times during the operation on Hodges, thereby breaching the standards of hospital accreditation of the Joint Commission on Accreditation of Hospitals, and owed by this hospital to this seaman in whose shoes Penn Tanker now stands and acts as assignee by operation of law.

8.

Penn Tanker's negligence was a proximate cause of the welding burn to the eyes sustained by James Hodges on August 15, 1963, and is liable therefor. This negligence on the part of Penn Tanker caused it to be also legally liable to James Hodges for all damages suffered by him or his estate, including the consequential damage occasioned by the negligence and malpractice chargeable to the Government.

9.

Since there is no evidence that maintenance was paid by Penn Tanker, and since neither Penn Tanker nor the Government is held responsible for the death of James Hodges, no portion of the settlement paid can be attributed to these potential elements of damage. The Court has considered all possible elements of damage and concludes that the proration hereinafter made gives full consideration to all possible elements of damage for which the Government would not be responsible.

10.

Inasmuch as the ultimate burden of damages is to be distributed between Penn Tanker and the Government, with each made to bear that portion of damages caused by its own negligent conduct,* Penn Tanker's negligence is a proximate cause of forty (40%) percent or $10,000 of the damages, and the negligence and malpractice chargeable to the Government are proximate causes of sixty (60%) percent or $15,000 of the damages paid to Mrs. Hodges based upon the overall disposition and settlement of the state court Jones Act suit for $25,000.

11.

The Court finds that the Plaintiff is not entitled to attorney's fees, and the allowable costs of this proceeding are taxed forty (40%) percent against the Plaintiff, Penn Tanker Company, and sixty (60%) percent against the Defendant, United States of America, consistent with the apportionment of damages set forth above.

* American Stevedores v. Porello, 330 U.S. 446, 458, 67 S.Ct. 847, 91 L.Ed. 1011 (1947); Barber S.S. Lines v. Quinn Bros., 94 F.Supp. 212, 213 (D.Mass. 1950); Herrero v. Atkinson, 227 Cal. App.2d 69, 38 Cal.Rptr. 490, 8 A.L.R.3d 629 (1964).